M5KHEriO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JOHN R. ERICKSON, individually
and on behalf of all others
similarly situated,

             Plaintiff,

        v.                  20 Civ. 9575 (MKV)

JERNIGAN CAPITAL, INC., et
al.,

                            Oral Argument

            Defendants.

------------------------------x

                            New York, N.Y.
                            May 20, 2022
                            10:05 a.m.

Before:

                HON. MARY KAY VYSKOCIL,

                            District Judge

                    APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
    Attorneys for Plaintiff
BY:  NOAM NOAH MANDEL
    SARAH DELANEY
    JONATHAN CHARLES ZWEIG

WINSTON & STRAWN LLP.
    Attorneys for Defendants
BY:  MATTHEW LAWRENCE DiRISIO
    DAVID M. STERN

M5KHEriO

(Case called)

THE COURT:  Please be seated everyone.

MR. MANDEL:  Good morning, your Honor.  Noam Mandel, for the plaintiffs.

THE COURT:  Good morning.

MR. MANDEL:  Good morning.  With me is Sarah Delaney and Jonathan Zweig from my office.

THE COURT:  Good morning, Ms. Delaney and Mr. Zweig.

Are you related to Michael Zweig?

MR. ZWEIG:  No, your Honor.

MR. DiRISIO:  Good afternoon, Your Honor.  Matt DiRisio, for the defendants, and with me is my colleague Mr. Michael Stern.

THE COURT:  Good morning, Mr. Stern, Mr. DiRisio.

Mr. DiRisio, you need to speak into the mic when you're talking because I'm having a little trouble hearing you. You can be seated.  It's up to counsel whether you want to speak from where you're at or use the lectern.  When you are addressing the Court, you're permitted to take your mask off, but then please put it back on when you're finished.

And good morning to our court reporter.  Thank you for being here.

All right.  So we're here on a motion by defendants under Rule 12 to dismiss.  So I will hear from -- who's going to take the lead?

MR. DiRISIO:  I will, your Honor.

THE COURT:  You may also remain seated if that's easier for you, because it's better to pick up with the mic.

MR. DiRISIO:  Thank you.  I think I better for the mic's purposes.

Judge, may it please the Court, Matt DiRisio, for Jernigan Capital and the individual defendants.

Jernigan issued its proxy statement for the NexPoint merger on September 23, 2020.  And in addition to describing all the aspects of the merger and the sales process, the fact that it's a 23 percent premium, there was no financing condition, no other bids emerged, it also cataloged NexPoint's efforts to secure both debt and equity financing for the merger and the challenges that it faced in doing that, to the point that NexPoint ultimately got its own closed-end funds and affiliates to commit to the financing with the understanding that that would be subject to release if they found other acceptable financing in accordance with the merger agreement and with JCAP.  They ultimately did just that.

THE COURT:  Not ultimately.  They did that within a relatively short time.

MR. DiRISIO:  They did, your Honor, on November 6, 2020.

THE COURT:  It didn't just materialize out of thin air, though.  That clearly is right.  That's the only inference

M5KHEriO

the evidence supports.

MR. DiRISIO:  Yes.

THE COURT:  So at some point in time prior to that, there must have been expressions of interest or discussions going on with the Extra Space people about that deal.

MR. DiRISIO:  Certainly prior to November 6, absolutely, there were.

THE COURT:  Right.  So supplemental disclosures were filed on October 16?

MR. DiRISIO:  Correct.

THE COURT:  So you are moving under Rule 12.  Am I not required under Rule 12 to draw every reasonable inference in favor of the party opposing the motion, and does not the evidence -- does not your own pleadings cry out for an inference, at least a plausible inference, that this transaction or discussions were in the works and should have been disclosed?

MR. DiRISIO:  Well, your Honor, I would say that, yes, plaintiffs are entitled to plausible inferences of well-pled facts, but under the PSLRA, they need to plead an omission with particularity, and right now what they're saying is that it closed on November 6.  There must have been some negotiations or diligence.  Therefore, there must have been something to disclose on September 23 or October 16.

THE COURT:  Right.

M5KHEriO

MR. DiRISIO:  But there is no duty to disclose an inchoate financing agreement.

THE COURT:  But how inchoate could it have been at that point in time, and isn't there a plausible inference that it wasn't sufficiently inchoate?  Generally speaking, you are correct, but doesn't that raise a fundamental question of fact on which, at a minimum, they're entitled to discovery?  You may prevail on that argument at summary judgment, but at a pleading stage?

MR. DiRISIO:  Well, I think it would potentially be an inference that there was a disclosable event if there was any duty to disclose, but there is no duty to disclose this.

THE COURT:  You may be correct, but you made an affirmative statement in your disclosures that there was limited interest.

MR. DiRISIO:  That's right, your Honor, and there was. And to be clear --

THE COURT:  They have a right to test that, though, don't they?

MR. DiRISIO:  Well, not if the proxy belies their allegation, and the proxy does belie it because throughout the entire sales process the next highest bid -- or there was no other bid.  The next highest indication of interest was $14.50. Every other bidder dropped out.  The disclosure says the limited interest other REITs in this space would likely have in

acquiring our portfolio because of the amount of lease-up in our properties and because of the fact that the process yielded no other acquisition bids. They were, in fact, told, based on the proxy by two bidders: Hey, we respect your business. We think your properties are great. We're not going to do a combination with you because you have so many lease-ups that we don't have an interest in the combination.

Nothing prevented Extra Space at any point in time from investing if they wanted to. And the inference here, the plausible inference, is that Extra Space wasn't sitting by waiting to invest in JCAP. Extra Space invested once this merger happened. That's --

THE COURT: When did the merger close?

MR. DiRISIO: The merger closed on November -- I'm sorry.

THE COURT: November 6?

MR. DiRISIO: November 6.

THE COURT: And on the 9th, you disclosed the deal. So in those three days, you're telling me --

MR. DiRISIO: Correct.

THE COURT: -- the only reasonable inference is the deal materialized in three days?

MR. DiRISIO: No, no, no. I'm saying that when the merger was announced, there was no financing condition. So it was going to happen no matter what NexPoint did to get

M5KHEriO

financing.  Same terms, same premium.  It didn't matter when Extra Space came in.  This could have been the same thing if the deal closed and NexPoint financed the deal, and five months later, Extra Space said:  Hey, I really like the synergies that are going on with this new company.  I want to invest.  I want to be --

THE COURT:  Five months later, then I would say your arguments about inchoate or perhaps nonexistent are far more plausible.

MR. DiRISIO:  But your Honor --

THE COURT:  But having a three-day gap, how can I draw an inference, which I'm required to do on a Rule 12(b) motion, that the only reasonable finding that a finder of fact could make is that you did not have this information at the time you made your disclosures?

MR. DiRISIO:  Your Honor, I would say that if there are negotiations going on, the very point is there is not a duty to disclose them, especially -- and my point about the five months was not a temporal proximity point.  It was that this financing in the post-closing combination, investment and preferred stock of the new company is just as irrelevant to the JCAP-NexPoint merger now as it would be in five months.  It means nothing.  It literally doesn't change anything for the stockholders.

And, frankly, just on the loss causation point, I

M5KHEriO

mean, the *Wesco* case, Judge Liman's decision and the affirmance early in '21 by the Second Circuit, faced the same formulation of loss causation; that is, a misleading proxy induced me to approve a merger that had inadequate consideration.  And the courts -- and in that case, by the way, they had analyst projections that said -- predicted they could get bids that were five or six bucks higher than the deal price.  They had initial management projections that were above the deal price.  And the court said that's just way too speculative.  That's not loss causation.  Second Circuit said it's too conclusory, and, frankly, your allegations that the true value of this stock is higher than the merger price are conclusory.

THE COURT:  In *Wesco*, did the company make an affirmative statement?  Now, the issue in my mind is you affirmatively stated there's a lack of interest.  And if at the same time you were negotiating with a company and able to close the deal with them three days after this merger, isn't there at least a plausible inference that there was interest in the company that could have caused the price to go higher?

MR. DiRISIO:  I think there's a plausible inference that there was interest in the post-closing company that was a new company.  And based on the press releases that the plaintiffs cite in the complaint, the new company was quite different.  It had NexPoint's real estate platform and sophistication and scale.  And the press releases say, look,

M5KHEriO

we're going to be able to break into an entirely new realm of properties here, multifamily, single family, as opposed to the big mass urban settings that JCAP had traditionally occupied. So there was a lot more going on.  It was a different company that Extra Space invested in.

But my point, getting back, your Honor, I don't think, candidly, that you need to get to that because the loss causation point is -- I think unequivocally foreclosed their formulation by *Wesco*, by *Kuebler v. Vectren Corporation*, by *In Re Resolute*, and as this court has found in *GTx*.  It's the same formulation.  And in those cases, the plaintiff actually at least had some indication of what they considered true value above the merger price.

THE COURT:  All right.  Counsel, be clear with me. Are you conceding that on a 12(b)(6) motion, you don't prevail on the "was there a false or misleading statement," and you're putting all your eggs in the loss causation basket?

MR. DiRISIO:  No, I'm not, your Honor.

THE COURT:  All right.  Then finish talking to me about the first point, which is what I'm focusing on with you. How, under the *Altemio* case, do you survive a motion to dismiss?

MR. DiRISIO:  So there are a couple of reasons.  That case, like all of these cases where there's this inference of falsity based on a subsequent event, that case had a proxy that

M5KHEriO

said there is no plan to merge or relist this company post-closing.  There were contemporaneous news articles reporting that before the merger, the very first proposal to the buyers of the take private included in it this relisting proposal.  There was contemporaneous evidence that it was a contradiction.  Aside from that, there was an expert that said it takes at least a year to do one of these.  They had, although they didn't purport to consider it, a confidential witness who was at a meeting talking about this before the merger.

So the idea that that case stands for the proposition that something happening 16 months later is a plausible inference of a concrete plan, it just doesn't apply here.  This isn't a merger.  This isn't a huge complex transaction.  It's a financing at a post-closing entity.  There would be no duty to disclose it anyway, but under the PSLRA, there has to be a particularized allegation of a material omission.  I take your point, your Honor, that Rule 12 does grant inference to the plaintiffs, but the PSLRA also makes them plead with particularity an omission.

THE COURT:  But their omission that they're alleging is that you were in discussions with Extra Space.  And I keep coming back to the question I asked you earlier.  Even if you're correct that there was no duty to disclose, when you speak, as you did, then you have a duty to speak in a way

M5KHEriO

that's not misleading, and you made an affirmative statement in your proxy materials that there's limited interest.

MR. DiRISIO:  Your Honor --

THE COURT:  Yet you were at the same time in discussions with a company.  I appreciate your point that it was an investment in the post-merger new company and all of that.  But at the pleading stage, have they not created enough of an inference to withstand your motion?

MR. DiRISIO:  I don't believe so, and I don't believe so because when you say that at the time -- that JCAP made the statement about there being limited interest in acquiring the portfolio of JCAP, a $300 million preferred stock investment in the post-closing surviving company is not an acquisition of JCAP's portfolio.  Extra Space did not acquire this portfolio.  They invested in the preferred shares of the new company.  And the closest they come, I guess, is a right of first offer on properties that may never be offered for sale by NexPoint Storage.  They didn't acquire anything.  They found --

THE COURT:  Doesn't the *Levinson* case tell me that question of materiality is really a question of fact that I can't resolve on this motion?

MR. DiRISIO:  Well, your Honor, no, I don't think it does.

THE COURT:  You're talking to me about what the transaction was and all of these details, but aren't they

M5KHEriO

entitled to develop at least a record?  And as I said before, maybe you win on summary judgment, but at the pleading stage when there's been no discovery with regard to loss causation, materiality, anything else?

MR. DiRISIO:  Well, they don't.  There is no fact-finding necessary for loss causation.  As pled it cannot --

THE COURT:  That's why I asked you before are you saying, regardless of anything else, loss causation is where you're putting your --

MR. DiRISIO:  Well, I do think that is a dispositive argument, but I'm also saying the *Basic* case is about the materiality of merger negotiations.

THE COURT:  Right.

MR. DiRISIO:  This is not a merger to begin with.  The merger was already done, and the merger was going to take place regardless of what Extra Space did here.  There was no change to it.  Now, the *Basic* case --

THE COURT:  Well, it may or may not have happened depending how the shareholders voted.

MR. DiRISIO:  Well, the shareholders --

THE COURT:  That's the whole point of the proxy disclosures.

MR. DiRISIO:  Correct, although -- and that does get into the point of materiality in *Basic*.

M5KHEriO

THE COURT:  Right.

MR. DiRISIO:  But that also conflates materiality with the duty to disclose, which *Basic* warned specifically against doing.

THE COURT:  I think it does conflate the two.  But then I get back again to the question I keep asking you about even if you're right that there wasn't a duty to disclose, when you speak at all, can you speak in a way that creates a false impression or is potentially or arguably misleading?

MR. DiRISIO:  No, no, there are situations, yes, where you can say something in a proxy that by virtue of omission is misleading, but on September 23, JCAP made the statement in the proxy that there was limited interest -- or there would likely be limited interest by other REITs in their portfolio.

THE COURT:  And that was in the 9/23 disclosure, not the supplemental?

MR. DiRISIO:  Correct.  The supplemental disclosure was largely to moot additional claims that had been alleged in the interim.  It was in the 9/23 proxy statement.

THE COURT:  OK.

MR. DiRISIO:  And at that time, it's completely borne out by the sales process.  As I said, aside from getting no other bids --

THE COURT:  That's my point.  I think the inference that could be drawn is that it's not borne out.

M5KHEriO

MR. DiRISIO:  But, your Honor, Extra Space did not --obviously did not beat JCAP's price and go in and acquire this company.

THE COURT:  But they didn't have to.  Your statement that there was limited interest is arguably misleading when at the same time you're talking about some kind of a transaction with Extra Space.

MR. DiRISIO:  But, your Honor, there is no allegation of fact or even a colorable inference that at that time there was some ongoing discussion with Extra Space about, well, after this merger, you know, let's get you involved in the post-closing company.  Just saying, well, since you closed this on November 6, 2020 --

THE COURT:  Like 45 days.

MR. DiRISIO:  Correct.

THE COURT:  That can't support an inference at a pleading stage?

MR. DiRISIO:  I don't think it does for purposes of the PSLRA.  I don't think it's a particularized fact.

THE COURT:  I understand your point.  I understand your point.  So talk to me more about the loss causation and any other arguments that you have.

MR. DiRISIO:  So the *Wesco* case -- and I apologize if I said this before.

THE COURT:  That's OK.

MR. DiRISIO:  It was the same formulation:  We were induced by a misleading proxy to approve a merger that had inadequate merger consideration.  We want damages of the difference between the true value and the merger price.  They based that on, as I think I said, analyst predictions of bids that they might receive for the company.

THE COURT:  Was that a motion to dismiss or a summary judgment motion?

MR. DiRISIO:  It was a motion to dismiss.

THE COURT:  OK.

MR. DiRISIO:  And the court -- oh, sorry.  And the court said, look, the analysts' predictions and initial management projections that outstripped the merger price are too conclusory to plead an economic loss versus a Section 14.  The much better evidence, in our opinion, and the more compelling inference of the true market price are the bids that they actually received.  Second Circuit affirmed and said, again, same thing.  This can't stand.  It's way too speculative that the idea that the true value was more than the merger price after a full-blown process.

The Third Circuit in *Resolute*, which I think was one of the cases we submitted in supplemental authority, added a somewhat different layer to that, which is there the plaintiff said, well, the true value was at least $3.50 more than the merger price.  Apparently, that was divined from omitted

M5KHEriO

projections.  And the court said, look, it's speculative, and you don't provide any plausible path toward how shareholders would have realized this apparent actual value.  You can't allege that -- you say nothing about what the market price was before, what it would have been if the shareholders voted it down.  So for that reason as well the Third Circuit said no loss causation.  *Kuebler v. Vectren* in the Seventh Circuit said the same thing, same formulation.  *GTx* case in this court, Judge Torres, held the same thing.  It has become very common amongst the circuit courts to deny this formulation of loss causation when there is just really no well-pled allegation of fact that the true price was more than the merger price.

Plaintiff offers two main cases to counter these circuit court decisions in *Wesco*, both of which neither discredit it or completely inapt in this circuit.  One is the *Baum v. Harman* case in the District of Connecticut where the court denied a motion to dismiss in 2019, I believe, and then a motion for judgment on the pleadings in 2021, which plaintiff submitted as supplemental authority.  The *Wesco* court here found that case was not supported by the law in the Second Circuit.  And even then --

THE COURT:  Circuit found that or Judge Liman found that?

MR. DiRISIO:  Judge Liman found that, affirmed by the Second Circuit.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M5KHEriO

THE COURT:  OK.

MR. DiRISIO:  Even in that case there was at least an indication because the company, as alleged, rejected a higher offer than the merger price.  It was $115 offer.  They rejected it purportedly to favor Samsung was the allegation.  *Karp v. First Connecticut* in the District of Maryland, very similar. Other courts have heavily criticized that as being incompatible with binding Second Circuit precedent for accepting this formulation of loss causation.  And again there was some indication the analysts had upgraded the target price to 37 bucks shortly before the merger at 32.

So here, by contrast, there really is no factual allegation that Extra Space's post-closing investment has any impact on the true value of the stock price of standalone JCAP. So on that basis, I think it's foreclosed.

THE COURT:  OK.  Anything else you want to tell me?

MR. DiRISIO:  Briefly, your Honor, and I won't belabor everything in our briefs.  I don't want to waste time, but I do want to just touch on the point of these purported misstatements in the proxy.

As we spoke about a bit, it has to be misleading at the time made, right?  And now the plaintiffs do try to get around that by citing to duty-to-update cases and half-truth cases, but all of these duty-to-update cases involve contradictory statements, things that happen subsequent that

M5KHEriO

render the statements contradictory.  There was knowledge these were just not true or became completely false.

THE COURT:  Well, that was the point I was talking to you about earlier, though.  Given the short amount of time, isn't it a reasonable inference to draw at the pleading stage that the statement was, in fact, false or at a minimum a half-truth or misleading?

MR. DiRISIO:  I don't think so, your Honor.  I think there's an inference that there were negotiations before November 6.

THE COURT:  Right.

MR. DiRISIO:  I think that's reasonable.  But I don't think it has anything to do with whether or not the statement there are, we think, likely to be limited interest in other REITs in acquiring our portfolio.

THE COURT:  Is that the full text, the precise text of what the disclosure was?

MR. DiRISIO:  The precise text -- yeah, I will.  It says:  "The limited interest other REITs operating in the self-storage sector would likely have in acquiring the company's portfolio, in light of its significant amount of lease up that would need to be completed for the development properties, as well as the fact that despite inquiries from and discussions with certain other parties, representatives of those parties indicated that they were not interested in

acquisition of the company on terms they believe would be acceptable to us or at all, and no other potential purchaser submitted an indication of interest for an acquisition of the company."

And there were two potential bidders, your Honor, who, as I said told, them exactly that.

THE COURT:  OK.

MR. DiRISIO:  So to me it's really an apples and oranges comparison to what the Extra Space ultimate acquisition really was, which was just an investment.

THE COURT:  In both of your briefs you devote about one page to loss causation, and yet now you seem to be telling me that if I don't accept your argument about materiality, that could be dispositive.  Have you fully told me everything you want to tell me about that issue, loss causation?

MR. DiRISIO:  Well --

THE COURT:  You're very conclusory in your brief.

MR. DiRISIO:  Your Honor, we may have bitten off more than we could chew in the briefs in the materiality.

THE COURT:  I'm sorry.

MR. DiRISIO:  Maybe we ran out of room after the materiality discussion.  I think part of the reason for that is --

(Discussion off the record)

MR. DiRISIO:  Part of that, I think, your Honor, is

M5KHEriO

that two circuit court decisions came down after the briefing that very much bolstered the decision in *Wesco*, and that was the biggest reason.

THE COURT:  All right.  Anything else you want to tell me?

MR. DiRISIO:  I don't think so, your Honor, at the moment.  Thank you.

THE COURT:  All right.  Thank you.

Then I will hear from the plaintiffs.

MR. MANDEL:  Thank you, your Honor.  I'll use the lectern if it's all right.

THE COURT:  Sure.

MR. MANDEL:  Just want to make sure you can hear me all right.

THE COURT:  We can hear you.

MR. MANDEL:  Very good.  Thank you.  Thank you, your Honor.  I'm going to try to be brief.

Defendants obtained shareholder approval for a transaction without disclosing all the material terms of that transaction, your Honor.  They solicited a vote in favor of a specific transaction, specific terms, specific parties, at a specific price.  Days later they closed a transaction with all these obviously material undisclosed terms.  There's 300 additional million dollars exchanging hands.  It's a third of the transaction cost overall.  There was a major industry

M5KHEriO

player at the table.  The company is selling exclusive rights to its portfolio of properties.  Nobody told the shareholders any of this.

THE COURT:  All right.  But it is an investment in a different company.  It is not somebody who was interested in buying the company in which your clients held shares.  It's somebody who made an investment in a new company.  So how is that material?

MR. MANDEL:  Well, your Honor, it's an entity that made an investment in the properties of the company, the portfolio of the company, the portfolio that the proxy says nobody in the business would have an interest in acquiring. It's an investment in the assets.  The defendants themselves describe it as a ringing endorsement of the properties, not just of the transaction.  That's material.

THE COURT:  Describe it post the Extra Space investment, you're saying?

MR. MANDEL:  I'm sorry?

THE COURT:  You said the company described it as a ringing endorsement of --

MR. MANDEL:  Of the properties and the transaction.

THE COURT:  When?  When did they say that?

MR. MANDEL:  After the disclosure of Extra Space's role in this transaction.

THE COURT:  That's what I was asking.

M5KHEriO

MR. MANDEL:  Yes, your Honor, I didn't understand.

Yes, after Extra Space's role here, undisclosed role here, was revealed to the world, it was described by the participants in the transaction themselves as a ringing endorsement in the properties of the transaction, in the properties of the company.  Any reasonable investor would want to know that information.  The test of materiality is very well established:  Does a reasonable investor regard that information as important in making a determination about how to invest and how to vote?  I think it's a very fair inference that any reasonable investor in that instance would regard as important -- even if it wasn't Extra Space, your Honor, the mere fact that there's an additional $300 million exchanging hands here, that that $300 million is exchanging hands in order to acquire an interest in the properties of the company, that alone is material information to an investor.  It reflects on the quality of the portfolio of properties, it reflects on the availability of capital for the transaction, it reflects an interest in acquiring the company's assets, etc.

And when you add to it the fact that Extra Space is a leading player in this specific space, is a major player, is a self-storage REIT in this market, just exactly what the reason for the merger that we were all discussing earlier that Mr. DiRisio quoted earlier refers to, says that the limited interest of other REITs operating in the self-storage sector

M5KHEriO

would likely have, when you add to it not only that Extra Space is a REIT operating in the self-storage sector, it's a self-storage REIT, but it's one of the preeminent self-storage REIT, it's one of the best performing companies in the S&P 500 writ large, let alone in this industry, obviously, that's material information.  Any investor would want to know it.  It's price-relevant Information.

It cuts really to the principal inquiry that was put to stockholders here, which is whether to accept this price for this transaction, and this information justified a higher price because it was such a vote of confidence in the assets, among other things.

THE COURT:  All right.  So what is the basis for your saying, though, that a higher price would have been justified? This really goes to the loss causation point.  Isn't the best evidence that the price was not suppressed or unreasonably low the fact that there were no other bids and that the only other interested parties withdrew from the bidding?

MR. MANDEL:  Well, your Honor, certainly that's a -- as your Honor pointed, out an argument that the defendants can make at the fact stage on a full record.  Right now I don't think that they're entitled to that inference.

THE COURT:  No, but under the PSLRA, you do have a pleading requirement.

MR. MANDEL:  Certainly.

M5KHEriO

THE COURT:  Where and how have you met the requirement to plead loss causation?

MR. MANDEL:  Very good.  Under the PSLRA the law -- the PSLRA says that the plaintiffs have the burden to prove loss causation.

THE COURT:  But that implies you have to plead it in the first instance.

MR. MANDEL:  Well, certainly.

THE COURT:  You don't have a claim if you don't plead it.

MR. MANDEL:  It's governed by notice pleading.  It's a Rule 8 standard.  There is no question that the defendants here are on notice of what the very clear theory of loss causation is, which is that had this information been disclosed, defendants would have had to pay more to stockholders to close this transaction.  The information here is obviously value-relevant, it's price-relevant information.  It has to do with the quality of the assets that the company owns, particularly when the defendants said that there was no interest, or limited interest, I should say, in those properties by anyone in the self-storage REIT sector.

THE COURT:  Let's just suppose that statement hadn't been made.

MR. MANDEL:  Yes, your Honor.

THE COURT:  Do you still think you prevail on this

M5KHEriO

motion, or does that statement somehow impact your argument?

MR. MANDEL:  No, I think the statement makes it all very clear-cut, and there's no real reason to go into this deeper analysis we've provided about the background, disclosure requirements of Schedule 14A, etc.  That statement is an obvious material misrepresentation here.

That said, the proxy, even without that statement, is materially misleading.  The proxy, as we point this out, I think it's in paragraph 33 of our complaint, the proxy says that it provides a complete description of the mergers and the related transactions, right?  At a minimum this is a related transaction.  We say it's part of the same transaction.  They said it's part of the same transaction.

THE COURT:  Where did they say that?

MR. MANDEL:  Extra Space in a press release quoted in the proxy says that -- I'm sorry not, in a press release, in an investor presentation quoted in the complaint says that this was part of the investment.  I'll give you the exact quote, your Honor, if I can just find it for a moment.

THE COURT:  But is the statement by Extra Space chargeable?

MR. MANDEL:  I don't know that it's an admission, but it's certainly a fact from which one could draw an inference --

THE COURT:  Of what?

MR. MANDEL:  -- that it's part of the same

M5KHEriO

transaction.  The participants in the transaction are saying it's all part of the same transaction.  You know, Mr. DiRisio wants to say, well, it's a financing.  They disclosed that they're doing financing perhaps.  This is not a financing.  Financings don't come with a seat on the board.  Financings don't come with a right of first offer on all the physical properties.

THE COURT:  They would if you negotiate that.

MR. MANDEL:  To say it's a financing, it's not a mere financing.  It's not a loan.  This is not a Citi or JP providing a loan on the properties.

THE COURT:  No, it's not a loan, you're right.

MR. MANDEL:  It's not traditionally what's understood as a financing.  At the very least, to think of this as a financing, that would be misleading.  A financing doesn't come with substantive governance rights, substantive rights to the underlying assets owned by the corporation.

So, again, just on that level, the proxy tells us that it's describing a full description of all the related transactions.  This is part of the same transaction, and there's nary -- there's not a word about it at all in the proxy.

If I could just go back to your Honor's point about loss causation.  *Gray v. Wesco*, which defendants cite here, does not hold at all, as a matter of law, that this theory of

M5KHEriO

loss causation is no longer available to plaintiffs.  We didn't -- your Honor pointed out there was very limited briefing on this point because defendants didn't make much of it in their papers.  We are happy to provide the Court with a long list of citations of cases recognizing this theory of loss causation certainly at the pleading stage.  And the defendants' position, in effect, is that the Second Circuit overturned all this law without saying so in a summary order.

THE COURT:  No, it's really not, at least for me. It's not a question of whether the theory survives.  The question is whether your pleading is sufficient to state a claim, and an element of your claim is loss causation.

MR. MANDEL:  Yes.  And drawing all reasonable inferences in favor of the plaintiff, it is definitely fair to infer that had this information been told to stockholders, stockholders would have understood there's another $300 million exchanging hands here.  There's, on that basis alone, a fair question in a stockholder's mind whether those funds ought to be fairly used to enhance the consideration.

There's this -- the defendants refer to it as a ringing endorsement in the properties.  Obviously, that's value relevant.  The principal assets of this corporation are its properties.  They're selling the corporation for a sum not disclosing a ringing endorsement in those very assets by a preeminent industry player.  That certainly pleads a reasonable

M5KHEriO

inference.  And certainly under notice pleading standards the defendants understand that theory.  That's not a theory that can't be supported.

And if your Honor just imagines for a moment that -- and, again, this is a very counterfactual scenario, and I don't want to engage too much in counterfactuals because I think that it's an unfair sort of argument that the defendants are using here for the most part.  But if this information had been disclosed in a vacuum, if the market learned, just -- if there was no merger on the table and the market learned that Extra Space was investing $300 million for these rights with respect to this company's assets, that would have had a very salutary effect on the stock price trading in the market.

THE COURT:  It might.  It might.

MR. MANDEL:  Well, certainly it might, and that's a credible basis for a pleading of loss causation.  Had this information been known to investors, investors would have questioned the fairness of this, of this consideration, particularly when they were told, except only -- we recommend you accept only 17.30 a share because of the limited interest that REITs in the self-storage sector would have in our properties days before they sold an interest in those properties to a REIT in the self-storage sector.  Defendants obviously recognize this as material.  They focused on this issue as a reason for the merger.

M5KHEriO

THE COURT:  What's the basis for your saying defendants obviously recognized it was material?

MR. MANDEL:  Well, defendants state in their proxy that one of the reasons for the merger is the lack of interest in these properties.  The reason to accept 17.30 a share is that this particular type of business that actually was participating in the transaction isn't interested in these types of assets.  That's one of the main material reasons you should accept only 17.30 a share here.  That's a -- I mean, the --

THE COURT:  Well, that's not exactly what the statement says.  It says that there's a limited interest by other REITs operating in the self-storage sector in acquiring the company's portfolio.

MR. MANDEL:  Yes.

THE COURT:  That's slightly different than what you just said.

MR. MANDEL:  Well, forgive me if I was speaking in shorthand, your Honor.  But at a minimum, to describe a limited interest by self-storage REITs in acquiring the company's portfolio while selling an interest in those properties to a self-storage REIT is at the very least a highly misleading statement, right?  This is your point about if you speak, you must speak fully and truthfully.  And this is at the very best a half-truth to say that REITs in the self-storage sector --

M5KHEriO

REITs in this sector, not that interested in our properties, limited interest, while selling an interest in those properties?  Yes, they didn't sell the properties themselves outright.

THE COURT:  Right.

MR. MANDEL:  OK.  That's a difference.  But a reasonable investor reads this statement, walks away from it understanding that what they're saying is that REITs in the self-storage sector are not that interested in this company's property, and at the very least the true facts show there was some interest in those companies by REITs in the self-storage sector because --

THE COURT:  Doesn't "limited interest" imply that there was some interest?

MR. MANDEL:  Your Honor, this sort of goes to -- the test here is not literal truth of the statement.  Even if, arguably, it's literally true that limited interest is consistent with what Extra Space did here, this is a -- literal truth is not the test.  The test is what does a reasonable investor reading the statement come away understanding?  A reasonable investor reading this statement from the company -- we didn't write this -- investor reads this statement and understand they're being told accept only 17.30 a share.  I mean, the company did a deal in internalization a few months earlier with stock price targets at $25 a share.  And, again,

M5KHEriO

there's no plea -- I didn't --

THE COURT:  But no bidder came in at those prices.

MR. MANDEL:  Well, sure, based on the proxy we understand that no bidder came in.  The proxy itself also left out a whole part of the transaction.  I think this is exactly --

THE COURT:  Well, the proxy wasn't in connection with the bidders who dropped away.

MR. MANDEL:  Well, the proxy -- I'm sorry.  I'm not sure I understand the point that the proxy wasn't in connection with the bidders who dropped away.  The proxy discloses some of those negotiations.  The bidders' names are under letters.  We don't know who they are.  We don't know all the facts.  The proxy discusses that.  The proxy doesn't disclose any discussion with Extra Space or --

THE COURT:  I understand that.

MR. MANDEL:  If it does, it's hidden under one of those letters, which itself would be, obviously, misleading to not disclose that Extra Space was one of the parties they were actually negotiating with.  I don't know that that's true.  Certainly, Mr. DiRisio keeps saying we all know Extra Space didn't want to invest in this property independently prior to this, and I don't know how we know that.

THE COURT:  I understand that point, and I think at this stage, as I said, I'm struggling with why that isn't a

M5KHEriO

reasonable inference, at least at the pleading stage.  So you don't need to address that any further.

MR. MANDEL:  So, again, just to the loss causation point, this pleads a clear theory of loss causation.  It's the sort of theory that has been accepted by lots of courts in this district.  I can quote -- and we didn't cite many of them in the briefing because it didn't seem necessary, particularly given that it's a matter governed by Rule 8.  The defendants are on notice of what the theory is, and this --

THE COURT:  And what is your theory?  Tell me expressly.

MR. MANDEL:  The theory of loss causation:  Had defendants complied with their disclosure obligations and had stockholders, therefore, known the true facts of this transaction and Extra Space's role in it, they would have insisted on higher consideration.  They would have insisted on a modification of this deal.  They would not have voted in favor of this deal.  Mr. DiRisio keeps saying, well, the deal was going to get done this way either way no matter what.  Well, as your Honor pointed out, not if the shareholders didn't vote for it, and that's really what we're talking about here.

THE COURT:  OK.  Anything else you want to tell me?

MR. MANDEL:  I'd point out only that to the extent the Court is interested in more facts that go to the pricing and what fair price would have been for purposes of loss causation,

M5KHEriO

those facts exist out there.  We'd be -- if this is the grounds for dismissal, we'd ask permission to replead to add those facts, but we do not believe that's necessary.

THE COURT:  Why didn't you plead them in the first instance if you're saying you know them already?

MR. MANDEL:  Because at the time we're writing this complaint, we're understanding ourselves to be pleading something that's a well-understood theory subject to notice pleading.  The defendants understood the same thing, too, which is why they devoted like a half a page in their brief to this issue.

THE COURT:  All right.

MR. MANDEL:  That's the same reason, your Honor.  We did not believe it was necessary.  We took to heart the dictate to try our best to put a short and plain statement of the case in before the Court.  I think we succeeded and maybe perhaps --

THE COURT:  Let me just ask you one further point along those lines.  What about the particularity overlay?

MR. MANDEL:  Well, the particularity requirement applies -- the Rule 8 governs this.

THE COURT:  Yes.

MR. MANDEL:  But the PSRLA, as you know, enhances the particularity requirement.

THE COURT:  That's why I'm asking you.  Speak to that issue.

M5KHEriO

MR. MANDEL:  Very good.  Under the Private Litigation Reform Act, the language of the statute, it doesn't actually say the word "particularity" interestingly.  It says that with respect to pleadings of material misrepresentations or omissions, a plaintiff must identify the statements you say are misleading; we do.  Must explain why you believe they are misleading; we do.  And it says that to the extent the pleading is based on information and belief, the complaint must set forth the facts upon which that information and belief is based.

That's exactly what we're talking about.  We're talking about a transaction that was large and complex and cannot reasonably be inferred to have been put together in a couple of days.  Those are facts that are pled in the complaint.  The fact -- and we plead the facts that the participants in the transaction themselves repeatedly described this as part of the same transaction and in connection with the same transaction and all those things, and those facts raise an inference --

THE COURT:  So are you pleading a nondisclosure case?

MR. MANDEL:  Well, the statement -- there are statements in here, affirmative statements, that we say are materially misleading, and there's certainly --

THE COURT:  What are those?  That's what I'm asking you.  Have you identified those specifically?  Is there

M5KHEriO

anything more than that statement limited interest -- I assume that's one of them.

MR. MANDEL:  That's the principal statement that we say is obviously a material misrepresentation, your Honor.

THE COURT:  OK.  Are there others, and have you identified them?

MR. MANDEL:  There are others.  We've identified them. But beyond that, even leaving aside the affirmative misstatement argument, our complaint goes through quite a bit of detail about the background disclosure obligations that apply here under Schedule 14A and under Rule 13e-3 applicable to going-private transactions.  Of course, a failure to disclose something is materially misleading if there is a duty to disclose.

THE COURT:  That's why I asked.  Are you pleading a nondisclosure case?

MR. MANDEL:  Yes, your Honor, we're pleading nondisclosure as well as affirmative material misrepresentation.

THE COURT:  That's what I asked you.

MR. MANDEL:  I understand.  I did not understand the question.  Forgive me, your Honor.

THE COURT:  Where does the duty to disclose come from on these facts?

MR. MANDEL:  Well, the duty to disclose arises from

M5KHEriO

Schedule 14A itself to begin.  Schedule 14A, which sets out the requirements of a proxy statement, requires disclosure -- and this is for all proximate statements, regardless of whether we're talking about a going-private deal -- requires you to state all material terms of the transaction, to provide "sufficient information to understand the essential features and significance of the proposed transactions, as well as the reasons for engaging in the transactions."

The quote that we're talking about, about the limited interest of REITs in the self-storage, that quote is included in there pursuant to the requirement to set forth the reasons for the merger.

THE COURT:  So going to the first two points, though, all material terms of the transaction, is that dependent on your argument to me that the Extra Space transaction is part of the same, or is, at a minimum, or related transaction?

MR. MANDEL:  Yes, your Honor.  We think that looking at the economic realities of this transaction and looking at the way the participants in the transaction described it, it is certainly more than fair to infer that this is all part of the same transaction.  And, yes, if you infer that to be the case, if you draw that factual conclusion, then certainly this was required disclosure under the plain language of Schedule 14A.

Everything I've read to you just now is from Item 14 of Schedule 14A.  There are other provisions in Schedule 14A

M5KHEriO

that are applicable.  I'm happy to go through them.

THE COURT:  I understand your point.

All right.  Is there anything further?

MR. MANDEL:  No, your Honor.  Thank you very much --

THE COURT:  All right.

MR. MANDEL:  -- for the Court's time.

THE COURT:  All right.  Brief reply?

MR. DiRISIO:  Yes, I'll be very brief.

THE COURT:  OK.

MR. DiRISIO:  First, I just want to read a statement about the ringing endorsement.

THE COURT:  Yes, thank you.  What is that from, please?

MR. DiRISIO:  I'm sorry.  It's from NexPoint's press release November 10, 2020.  We have copies, your Honor, if it would be helpful.

THE COURT:  Were they part of the briefing?

MR. DiRISIO:  They were referenced in the complaint, but I don't believe that they were attached to anything.

THE COURT:  All right.  If you have them, that would be helpful.  If they're referenced in the complaint, I'll take a look at whether they are sufficiently referenced to be deemed incorporated.

MR. DiRISIO:  There are three articles, your Honor.  Would you like each of them?

M5KHEriO

THE COURT:  Sure.  Thank you.

Are they all referenced?

MR. DiRISIO:  They are.

THE COURT:  Yes, that would be helpful, then.  Thank you.

MR. DiRISIO:  And it says:  "We view the sizable investments in the platform by Extra Space storage and JPMorgan as ringing endorsements of the transaction itself, the quality of the JCAP properties and team, and the positioning of NexPoint Storage Partners for substantial growth and is a key player in the self-storage industry."

THE COURT:  Right.  And in another statement they described what you're calling an investment as part of NexPoint's acquisition.

MR. DiRISIO:  Neither NexPoint nor JCAP makes that statement, your Honor.

THE COURT:  I appreciate that.  I asked about that. But is that not evidence that a finder of fact could consider in terms of making a decision about whether this was in fact all one integrated transaction or, at a minimum, two closely related transactions such that there should have been more disclosure?

MR. DiRISIO:  No, your Honor.  It's not from either party to this merger, and there's no -- just getting back to the point, Mr. Mandel keeps saying that at the same time you're

M5KHEriO

saying this in the proxy, you're selling assets, there is no indication that there was any ongoing sale of assets or even negotiations with Extra Space at the time of the proxy.

THE COURT:  I just don't accept that.  I mean, at a minimum at the pleading stage, given the three-day time span, it is a plausible inference that those discussions were materially advanced.

MR. DiRISIO:  On September 23rd?  Your Honor.

THE COURT:  I said the three days.  So between the time you closed the one, what you're calling one transaction, and the time that the Extra Space transaction took place, you have a three-day span.  At a pleading stage, it is a plausible inference that between the time you made your initial disclosures and the closing of the transactions, there was enough happening that you had a duty to supplement, having spoken in some respect on the topic.

MR. DiRISIO:  So, your Honor, I would just say I think the reason that there's not a duty to disclose ongoing negotiations is because it's impossible to determine from a corporate perspective when you would do that.  Is it a preliminary term sheet?  Is it exclusivity?  Is it the next draft of the term sheet?

THE COURT:  If it were a freestanding transaction, I appreciate your point completely.

MR. DiRISIO:  Your Honor, it is a freestanding --

M5KHEriO

THE COURT:  It is -- well, but that's the question. That's the ultimate question, is it a freestanding transaction?

MR. DiRISIO:  Well, Mr. Mandel says an extra 300 million changing hands.  There's -- or an additional. There's not an additional 300 million changing hands.  The merger consideration was what it was.  It was going to be financed either by NexPoint or somebody else if they could get somebody to come in and fill it in.  They did that.  Honestly, the idea that the stock price might have been affected if shareholders knew that Extra Space was investing in the preferred stock of the post-closing entity is not enough to plead -- you have to plead some plausible economic injury. That it might have an effect on the stock price doesn't do it.

THE COURT:  All right.  I understand your point.

MR. DiRISIO:  Thank you, your Honor.  That's all I have.

THE COURT:  All right then.  Thank you both very much. I want to go back and look at some of the cases and some of the specifics of the allegations, and we will get you a decision as promptly as we can.

All right.  Thank you.

MR. MANDEL:  Thank you, your Honor.

THE COURT:  Have a good day, everyone.  Enjoy the weekend, the summer.  And thank you to our court reporter.

(Adjourned)